UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
YVONNE PURDIE,

             Plaintiff,

    - against -                   **MEMORANDUM AND ORDER**

                                 13 Civ. 6423 (NRB)

CITY UNIVERSITY OF NEW YORK, PRESIDENT
JEREMY TRAVIS in his official capacity,
ROBERT PIGNATELLO, individually and in
his official capacity, and DONALD GRAY,
individually and in his official
capacity,

             Defendants.
---------------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

      Plaintiff Yvonne Purdie is an African-American employee of the City University of New York ("CUNY").  Plaintiff alleges that two CUNY administrators discriminated on the basis of her race in selecting a White candidate, rather than plaintiff, to become Director of Human Resources at CUNY's John Jay College of Criminal Justice in 2011.  Specifically, plaintiff alleges that defendant Donald Gray (plaintiff's supervisor until late 2011) recommended the White candidate, that defendant Robert Pignatello (a more senior administrator) appointed the White candidate, and that Pignatello covered up his discriminatory action by wrongfully reprimanding plaintiff and transferring her out of the Human Resources Department.

Plaintiff additionally asserts that, in early 2013, some agent of CUNY urged plaintiff's new manager to "manage her out" of her job in retaliation for filing discrimination complaints with state and federal agencies.

For the reasons stated in this opinion, we grant in part and deny in part defendants' motion to dismiss certain claims.

### BACKGROUND[1]

### I.    CUNY Fails to Promote Plaintiff.

At the times relevant to this case, plaintiff, an African-American woman, worked in the administration of John Jay College, a component college of the CUNY system.  Am. Compl. ¶¶ 7, 30, 71.

Before joining John Jay as an employee, plaintiff obtained two degrees there: a B.S. in Legal Studies and an M.P.A. with a concentration in Human Resource Management.  ¶¶ 31–32.  She later obtained an additional certification in human resource management from St. Joseph's College and taught a course in the subject at John Jay for several years.  ¶¶ 33–34.

From 1998 to 2012, plaintiff worked in John Jay's Human Resources Department.  See ¶¶ 36, 39(1), 71.  Over the years, her supervisors gave her several positive performance evaluations, and the college president, defendant Travis, awarded her early salary

---

[1] The facts recited here are drawn from the Amended Complaint filed March 4, 2014 ("Am. Compl.").

increases in recognition of her excellent work.  ¶¶ 36–45.  For much of this time, plaintiff worked under defendant Gray, who, as of late 2012, was both Director of Human Resources and Dean of the College.  See ¶ 40 (Gray "oversaw and ratified" plaintiff's evaluations from 1998 to 2002); ¶ 14.  Plaintiff eventually became a Deputy Director of Human Resources, one step down from Director Gray.  ¶ 19.

In late 2011, Gray announced that he was moving from the Human Resources Department to a position in the College's Office of Legal Counsel.  ¶ 13.

CUNY's normal protocol for filling a vacant or new position was to solicit applications internally and externally and to review applicants through a formal hiring committee.  ¶ 17.  CUNY management, however, did not apply this protocol to fill Gray's vacancy either temporarily or permanently.  ¶¶ 18, 25, 26.

Instead, within days of the vacancy, defendant Pignatello, the College's Senior Vice President of Finance and Administration, summarily appointed Gulen Zubizaretta, a White woman who was, like plaintiff, a Deputy Director of Human Resources, to be the Interim Director.  ¶¶ 18–19.  Defendant Gray recommended Zubizarreta to

Pignatello for this interim position, and defendant Travis confirmed Pignatello's decision.  ¶¶ 20-21.[2]

Defendant Pignatello took charge of the search for a permanent Director, but did not announce the position publicly or refer applications to a hiring committee.  ¶¶ 18, 25.  In March 2012, he asked a senior CUNY manager to appoint Zubizarreta as permanent Director of Human Resources, and Zubizarreta was appointed to that position in April 2012.  ¶¶ 22-24.

In hiring Zubizarreta, the College allegedly ignored the formal job qualifications that it had set out for the position of Director.  Those qualifications were a bachelor's degree (master's degree preferred); eight years of related experience in positions of increasing responsibility; and "evidence of exceptional achievement and demonstrated skills in contract compliance, personnel systems, and strategic human resource planning and management."  ¶¶ 27-29.  Plaintiff met each of these qualifications through her John Jay degrees, her 13-year employment history at John Jay, and her professional development.  ¶¶ 30-35. Zubizarreta, on the other hand, lacked eight years of experience in human resources, had held the position of Deputy Director at the

---

[2]CUNY's formal process for appointing John Jay administrators is not precisely clear from the complaint.  However, the complaint adequately alleges that Pignatello played a decisive role in selecting Zubizarreta, with Gray's advice.

College for eight years fewer than plaintiff, and lacked a master's degree in a relevant field.  ¶¶ 46–48, 50–51.

Based on these circumstances, plaintiff alleges that CUNY (and, individually, Pignatello and Gray) failed to promote her on account of her race.  To lend further credence to this allegation, plaintiff states that John Jay (again through Pignatello and Gray) nearly promoted a White woman instead of plaintiff in 2005.  ¶ 58. (At the behest of a diversity committee, the College hired neither plaintiff nor the other applicant.  ¶ 58.)

Plaintiff also alleges that Pignatello tried to "cover up" his discriminatory actions by blaming plaintiff for the Human Resources Department's failure to properly adjust the salaries of the College's civil servants.[3]  ¶ 59.  Within a month after permanently promoting Zubizarreta, Pignatello formally reprimanded plaintiff for this failure, and transferred plaintiff to the Office of Student Affairs in May 2012.  ¶¶ 60–61, 71.  According to plaintiff, this reprimand was unwarranted, because the task of

---

[3]Plaintiff's opposition brief (ECF No. 25, "Pl. Mem.") clarified that her non-promotion was the only adverse employment action that she alleges suffering on account of racial discrimination.  The subsequent reprimand and transfer were, according to plaintiff, "components of a discriminatory scheme," Pl. Mem. at 13, and that CUNY's request for a supervisor to manage plaintiff out was retaliatory rather than discriminatory.  We accept (as do defendants) that plaintiff's non-promotion was an adverse employment action. However, we reserve judgment on the questions of whether the reprimand and transfer are admissible as evidence of discrimination with respect to the non-promotion and whether the reprimand and transfer were so related to the non-promotion that a finding of discrimination with respect to the non-promotion would permit equitable relief with respect to the reprimand and transfer.

adjusting civil servants' salaries belonged to Zubizarreta, rather than to plaintiff.  ¶ 63.

## II.  CUNY Encourages Plaintiff's Supervisor to Manage Plaintiff Out.

On July 24, 2012 (less than four months after Zubizarreta's permanent appointment, plaintiff's reprimand, and plaintiff's transfer to Student Affairs), plaintiff filed complaints with the New York State Division of Human Rights (SDHR) and the Equal Employment Opportunity Commission (EEOC).  ¶ 70.

Plaintiff continued to work for John Jay in the Office of Student Affairs, and received a "very favorable" recommendation from her new supervisor, Tom Stafford, in March 2013.  ¶ 71.

However, plaintiff believes that, when Lynette Cook-Francis replaced Stafford later that month, some unnamed CUNY official encouraged Cook-Francis (in the words of the Amended Complaint) "to manage Plaintiff out of her employment."  ¶ 72.  In order to justify removing plaintiff, CUNY told Cook-Francis that CUNY would blame plaintiff for problems in the College's Human Resources Department.  ¶ 74.  In exchange for Cook-Francis's help, the College promised to reward Cook-Francis with continued funding for plaintiff's position and freedom to choose a replacement.  ¶ 73.

Plaintiff does not allege that Cook-Francis took any specific retaliatory action in response to CUNY's request.  Nor does

plaintiff allege that she has left CUNY, whether through formal termination, constructive termination, or any other means.  (The complaint is silent as to whether plaintiff still works for the College, even though this information is surely within plaintiff's knowledge.)

Based on these circumstances, plaintiff alleges that CUNY retaliated against plaintiff for filing complaints with the SDHR and the EEOC.

## III. **The Present Action**

The SDHR dismissed plaintiff's complaint for administrative convenience, so that plaintiff could pursue her federal and state remedies together in this Court.  See Recommended Order of Dismissal, In re Purdie v. City Univ. of New York, No. 10156545 (N.Y.S. Div. of Hum. Rts. July 16, 2013) (citing N.Y. Exec. Law § 297(3)(c)), filed as ECF No. 22, Ex. C.  Plaintiff received a right-to-sue letter from the EEOC soon thereafter, see Dismissal and Notice of Rights, No. 16G-2012-04116 (E.E.O.C. Aug. 22, 2013), filed as ECF No. 22, Ex. D, and filed a complaint in this Court on September 12, 2013.  After defendants moved to dismiss the original complaint (ECF No. 9), plaintiff amended her complaint in order to moot certain grounds that defendants had raised for dismissal (ECF No. 14; see also Letter, ECF No. 12).

The Amended Complaint raises four causes of action:

-7-

1.    against CUNY, under Title VII,[4] with respect to CUNY's failure to promote plaintiff on account of her race and CUNY's retaliation for plaintiff's filing of complaints with the SDHR and the EEOC;[5]

2.    against the individual defendants, in their individual and official capacities, under the Equal Protection Clause and section 1983,[6] with respect to CUNY's failure to promote plaintiff;

3.    against the individual defendants (in their individual and official capacities), under the New York State Human Rights Law,[7] with respect to CUNY's failure to promote plaintiff; and

4.    against the individual defendants (in their individual and official capacities), under the New York City Human

---

[4]Civil Rights Act of 1964, tit. VII (codified as amended at 42 U.S.C. §§ 2000e to 2000e-17).

[5]Although it is not entirely clear from the Amended Complaint's recitation of the causes of action (Am. Compl. ¶¶ 81-87), we understand that plaintiff's retaliation claim arises only against CUNY under Title VII. Plaintiff cannot sue any individual defendant in an individual capacity for retaliation, because the facts in her Amended Complaint do not tie any individual defendant to CUNY's alleged retaliation. Plaintiff cannot sue any individual defendant in an official capacity for retaliation, because she does not appear to seek any equitable relief with respect to the alleged retaliation.

[6]U.S. Const. amend. XIV, § 1, cl. 4; 42 U.S.C. § 1983.

[7]N.Y. Exec. Law §§ 290-301.

Rights Law,[8] with respect to CUNY's failure to promote plaintiff.

Under these four causes of action, plaintiff seeks monetary damages (back pay, other compensatory damages, punitive damages, attorneys' fees, and costs) against CUNY and against defendants Pignatello and Gray individually.  She also seeks equitable relief, namely the expungement of her reprimand, a transfer back to the Human Resources Department, and promotion to the position of Director of Human Resources.

Defendants accept that plaintiff may sue CUNY under Title VII; that plaintiff may sue CUNY employees in their individual capacities under section 1983 and the State Human Rights Law; and that plaintiff has stated a plausible claim that CUNY and Pignatello failed to promote plaintiff on account of her race.

Defendants move to dismiss the remaining portions of the Amended Complaint on four grounds.  First, that certain defendants are immune from plaintiff's state-law and city-law claims.  Second, that plaintiff has failed to state a federal or state-law discrimination claim against her former supervisor, defendant Gray. Third, that plaintiff has failed to state a federal or state-law retaliation claim against any defendant.  Fourth, that the individual defendants in their official capacities are not

---

[8]N.Y.C. Admin. Code § 8-107.

necessary defendants because plaintiff may obtain injunctive relief directly against CUNY.

**DISCUSSION**

**I.     SOVEREIGN IMMUNITY**

>   **A.     Individual Defendants Sued in Official Capacities Under the State and City Human Rights Laws**

Defendants argue that the individual defendants, in their official capacities, are immune from suit under the State and City Human Rights Laws.

It is undisputed that CUNY is an arm of New York State, and is therefore immune from suit in this Court unless an exception to sovereign immunity is found.  See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 123–24 (1984); Hans v. Louisiana, 134 U.S. 1 (1890) (applying sovereign immunity to suit between state and its own citizen on a question of federal law); Clissuras v. City Univ. of New York, 359 F.3d 79 (2d Cir. 2004) (holding that a senior college of CUNY is immune from suit); Pollner v. John Jay Coll. of Crim. Justice/CUNY, No. 12-cv-5978 (CM) (RLE), 2013 WL 3833031 at *3 (S.D.N.Y. July 22, 2013) (noting that John Jay is a senior college of CUNY).

Absent an exception, employees of CUNY are also immune from suit in their official capacities because "an official-capacity

suit is, in all respects other than name, to be treated as suit against the entity." Kentucky v. Graham, 473 U.S. 159, 166 (1985).

Here, there is no exception. Congress has abrogated sovereign immunity with respect to plaintiff's Title VII claims, see Fitzpatrick v. Bitzer, 427 U.S. 445, 457 (1976), but not with respect to state-law actions that are brought to federal court through supplemental jurisdiction. See Raygor v. Regents of the Univ. of Minnesota, 534 U.S. 533, 541–42 (2002). New York has not consented to suit under the State or City Human Rights Law. See Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004) (City Human Rights Law); Cassells v. Univ. Hosp. at Stony Brook, 740 F. Supp. 143, 147–48 (E.D.N.Y. 1990) (State Human Rights Law). And the doctrine of Ex parte Young, 209 U.S. 123 (1908) (permitting official-capacity suit for prospective injunctive relief), applies only to violations of federal law. See, e.g., Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland, 535 U.S. 635, 645 (2002).

Therefore, we dismiss plaintiff's claims under the State and City Human Rights Laws against the individual defendants in their official capacities.

**B.**   <u>Individual Defendants Sued in Individual Capacities Under</u>
      <u>the City Human Rights Law</u>

Defendants also argue that defendants Pignatello and Gray in their individual capacities are immune from suits under the City Human Rights Law.

New York <u>City</u>, cannot abrogate the sovereign immunity of New York <u>State</u>, and New York State has not waived its immunity to suits under the City Human Rights Law.   <u>See</u> <u>Feingold</u>, 366 F.3d at 149. The question we must answer, then, is whether the State's own immunity from municipal-law suits extends to the State's employees as individuals.

We lack jurisdiction over a state-law (or municipal-law) claim if <u>either</u> federal <u>or</u> New York doctrine immunizes the defendants from suit.   <u>See</u> <u>Pennhurst</u>, 465 U.S. at 121–23 (Eleventh Amendment barred state-law claims from being heard in federal court even though such claims could have been brought in state court); <u>Bosold v. Warden, SCI-Somerset</u>, Civ. No. 11-4292, 2011 WL 6812902 (E.D. Pa. Dec. 28, 2011) (Pennsylvania law of sovereign immunity barred state-law claims for money damages from being heard in federal court against individual defendants).

It is clear that the federal doctrine of sovereign immunity does not bar an individual-capacity suit for a money judgment against a government employee.   <u>See</u> <u>Larson v. Domestic & Foreign</u>

-12-

Commerce Corp., 337 U.S. 682, 687 (1949) ("no jurisdictional difficulty" in a suit for damages against a public officer when the "judgment sought will not require action by the sovereign or disturb the sovereign's property").

New York doctrine leads to the same result.  In New York,

> [a] suit against a State officer will be held to be one which is really asserted against the State when it arises from actions or determinations of the officer made in his or her official role and involves rights asserted, not against the officer individually, but solely against the State.

Morell v. Balasubramanian, 514 N.E.2d 1101, 1102 (N.Y. 1987). Thus, an officer is not immune from suit simply because the suit arises out of his official actions; for an officer to be immune, the suit must also really assert rights against the state.

Under this rule, a suit for money damages is treated as a suit against the state if it demands that the officer pay over state money, or if the suit is for a tort or breach committed by the state itself.  See, e.g., Psaty v. Duryea, 118 N.E.2d 584 (N.Y. 1954) (suit for refund money paid along with a mistaken contracting bid); Niagara Falls Power Co. v. White, 55 N.E.2d 742 (N.Y. 1944) (suit intended to determine water rights between plaintiff and state); Samuel Adler, Inc. v. Noyes, 32 N.E.2d 781 (N.Y. 1941) (suit for refund of money paid along with a license application that was denied).  By contrast, a suit for money damages is treated

as a suit against the officer individually if it demands that the officer himself pay money to compensate for the breach of a duty that the officer personally owed to the plaintiff.  See, e.g., Morell, 514 N.E.2d at 1103 (no immunity for medical malpractice committed by employee of state hospital); Murtha v. N.Y. Homeopathic Med. Coll. & Flower Hosp., 126 N.E. 722, 722 (N.Y. 1920) (Cardozo, J.) (no immunity for tort committed by hospital's agent, even though hospital itself operated as on of the state); cf. Niagara Falls Power, 55 N.E.2d at 745 ("If the complaint contained . . . charges [of actual trespass by officers or direct physical interference with enjoyment of property rights], they could, perhaps, be held individually to account . . . .").

To support their conclusion that the individual defendants are immune in their individual capacities, defendants cite a garbled sentence from a New York trial court's unpublished decision on summary judgment.  See Espinal v. City Univ. of New York, No. 7541/2010, Mot. Seq. No. 2, Mot. Cal. No. 17, (N.Y. Sup. Ct. Queens Cnty. July 18, 2013).  The relevant passage, found in a section labeled "Sovereign Immunity," states:

> Finally, while true that an officer or agent can be sued in his or her individual capacities for acts in violation of NYCHRL, and those cases cited by plaintiff support this contention, this Court does not find that [defendant] Hickey was acting in such a way as to her ultra vires her authority and the

-14-

> extension of the State's immunity as discussed
> in <u>Joan</u> [sic] and <u>Larson</u>.

<u>Espinal</u>, op. at 3 (citing <u>John v. Hoag</u>, 500 N.Y.S.2d 950, 954 (Sup. Ct. Cattaraugus Cnty. 1986), and <u>Larson</u>, 337 U.S. at 689) (internal citations omitted).  We believe that <u>Espinal</u> supports our conclusion that sovereign immunity does not bar City Human Rights Law suits against state employees.  <u>Espinal</u> acknowledges that, at least in some cases, individual state employees may be sued under the City Human Rights Law, and relies on <u>Larson</u>, which itself recognized that sovereign immunity does not bar individual-capacity suits.

To the extent that <u>Espinal</u> holds otherwise, we are not persuaded by its reliance on <u>John</u>.  The facts in <u>John</u> are somewhat obscure, but it appears that the defendants (officers of the Seneca Nation) were sued for collecting revenue as their duties to the Seneca Nation required.  If this revenue collection injured the plaintiff, then the entity that harmed the plaintiff was the Seneca Nation, not the officers individually.  Thus, the Seneca Nation's officers could not be held liable for their essentially ministerial acts.

By contrast, the City Human Rights Law imposes upon every manager a personal duty not to aid racial discrimination.  N.Y.C. Admin. Code § 8-107(6) ("It shall be an unlawful discriminatory

practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or any attempt to do so."). Therefore, a manager may be held individually liable under the City Human Rights Law for acts that he knowingly commits in aid of an employer's discrimination. For this reason, we do not dismiss the City Human Rights Law claims against Pignatello and Gray.[9]

This conclusion is consistent with our observation that individual-capacity suits against state employees are seldom challenged on the basis of sovereign immunity. See Feingold; Meyer v. N.Y. Off. of Mental Health, No. 12-cv-6202 (PKC), 2014 WL 1767818 at *7 (E.D.N.Y. May 2, 2014) (denying Rule 12(b)(6) motion to dismiss individual-capacity claims brought under City Human Rights Law against a state employee); Shanahan v. New York, No. 10-cv-742 (RWS), 2011 WL 223202 at *11 (S.D.N.Y. Jan. 24, 2011) (dismissing official-capacity claims brought under City Human Rights Law on grounds of sovereign immunity, but dismissing individual-capacity claims on the merits).

---

[9] We note in passing that the jurisdictional defense of sovereign immunity is distinct from the merits defense of qualified or absolute official immunity. See, e.g., Tango ex rel. Tango v. Tulevech, 459 N.E.2d 182, 185–86 (N.Y. 1983) (describing contours of official tort immunity). Because defendants have moved to dismiss only on sovereign immunity grounds and have not yet answered the Amended Complaint, we express no view as to whether an official immunity defense is viable.

## II.   FAILURE TO STATE CLAIMS

### A.   Legal Standards

When deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, we must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007). Nevertheless, a plaintiff's factual allegations "must be enough to raise a right of relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citation omitted).  If she has not "nudged [her] claims across the line from conceivable to plausible, [her] complaint must be dismissed."  Id. at 570; see also Ashcroft v. Iqbal, 556 U.S. 662, 682 (2009) (applying Twombly to "all civil actions," including discrimination suits).  Twombly "does not prevent a plaintiff from pleading facts 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible."  Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (internal citations omitted).

A complaint is sufficient when it meets this standard, regardless of whether the complaint includes enough facts to make out a prima facie case under the ornate analytical frameworks that

apply to discrimination cases at summary judgment and at trial. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002); EEOC v. Port Auth. of New York and New Jersey, 768 F.3d 247, 254 (2d Cir. 2014); cf. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–07 (1973) (announcing burden-shifting framework for discrimination claims); Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005) (applying McDonnell Douglas burden-shifting to retaliation claim).

In order to state a claim for employment discrimination (whether under Title VII, section 1983, or the State Human Rights Law), a plaintiff must plausibly allege that her employer took an "adverse employment action" against her because of her membership in a protected class. See Patane v. Clark, 508 F.3d 106, 112 & n.3 (2d Cir. 2007) (Title VII); see also Feingold, 366 F.3d at 159 (observing that, once state action is established, section 1983 and Title VII discrimination claims "stand or fall together"); Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (analyzing State Human Rights Law claim under same framework as Title VII claim at summary judgment).

In the context of a discrimination claim, an adverse employment action is a "'materially adverse change' in the terms or conditions of employment," Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (quoting Richardson v. N.Y. State Dep't of

-18-

Corr. Servs., 180 F.3d 426, 446 (2d Cir. 1999)), typically a "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Id. (quoting Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)) (internal modifications omitted).

In order to state a claim for retaliation, a plaintiff must plausibly allege that the employer took an "adverse employment action" because the plaintiff took part in activity protected by Title VII (such as filing a discrimination claim). See Tepperwien v. Entergy Nuclear Opers., Inc., 663 F.3d 556, 567–68 (2d Cir. 2011).

In the context of a retaliation claim, an adverse employment action is any action that "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quoting Washington v. Ill. Dep't of Rev., 420 F.3d 658, 662 (7th Cir. 2005)). This is a much broader definition than applies to discrimination claims, "in the sense that it extends beyond pay and other tangible employment actions." Washington, 420 F.3d at 661. Depending on the particular circumstances, it may be actionable to conduct a lengthy investigation that "place[s] a

cloud over [an employee's] career," Velikonja v. Gonzales, 466 F.3d 122, 124 (D.C. Cir. 2006), to transfer an employee to a position outside her expertise, Ragusa v. Malverne Union Free Sch. Dist., 381 F. App'x 85, 90 (2d Cir. 2010), to suspend an employee without pay (even if the employer later provided backpay), White, 548 U.S. at 72-73, or to place a reprimand in an employee's personnel file for one year, Millea v. Metro-North R. Co., 658 F.3d 154, 165 (2d Cir. 2011) (applying White standard to anti-retaliation provision of the Family and Medical Leave Act).

### B.   Failure to State a Discrimination Claim Against Defendant Gray

Defendant Gray argues that, even though plaintiff has stated a plausible discrimination claim, plaintiff has failed to allege that Gray was sufficiently involved in CUNY's alleged discrimination in order to be personally liable under section 1983 and the State Human Rights Law.

Plaintiff's allegations against Gray come down to the following.  Until October 2011, Gray was Dean of the College and Director of Human Resources.  As Director of Human Resources, Gray knew of plaintiff's strong evaluations between 1998 and 2002, and knew that plaintiff's qualifications and experiences were superior to those of Zubizarreta's.  Nevertheless, Gray recommended that

Zubizarreta, rather than plaintiff, become Interim Director of Human Resources.

Gray is correct that a negative recommendation——taken by itself——is not an adverse employment action in the context of a discrimination claim.  For example, in <u>Greene v. Brentwood Union Free School District</u>, 966 F. Supp. 2d 131 (E.D.N.Y. 2013), <u>aff'd</u>, 576 F. App'x 39 (2d Cir. 2014), a school principal informed an assistant principal that the principal planned to recommend the assistant principal's termination at the next meeting of the school board, but the assistant principal voluntarily resigned before the school board decided whether to fire her.  The court held that the principal's recommendation did not constitute an adverse action.  Because the assistant principal was not fired (or, as the court held, constructively terminated) on the basis of the principal's recommendation, plaintiff failed to state the element of an adverse employment action.  <u>See also Weisbecker v. Sayville Union Free Sch. Dist.</u>, 890 F. Supp. 2d 215, 233-36 (E.D.N.Y. 2012) (granting summary judgment on similar facts and collecting cases for the proposition that a mere threat of an adverse action is not itself an adverse action).

These cases are distinguishable, however.  In each of these cases, the plaintiff voluntarily resigned before the threatened or recommended action came to pass.  When a supervisor's

discriminatory recommendation actually results in an adverse action, though, the supervisor is liable for causing that adverse action. See N.Y. Exec. Law § 296(6) ("It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."); Feingold, 366 F.3d at 157-58; Cole-Hoover v. N.Y. Dep't of Corr. Servs., No. 02-cv-826 (M), 2010 WL 2510953 at *2 (W.D.N.Y. June 17, 2010) (denying summary judgment to individual defendants whose accusations of plaintiff's misconduct allegedly led to plaintiff's suspension); cf. Rose v. N.Y.C. Bd. of Educ., 257 F.3d 156, 162 (2d Cir. 2001) (accepting plaintiff's reliance on discriminatory statements made by an "immediate supervisor" with "enormous influence in the decision-making process," and remanding for new trial); Benbow v. State Univ. of New York-New Paltz, No. 1:11-cv-870 (LEK/CFH), 2014 WL 1871863 (N.D.N.Y. May 8, 2014) (holding plaintiff's termination to be actionable even though decision-maker was three recommendations removed from a prejudiced supervisor);

In this case, plaintiff has unquestionably pleaded an adverse employment action: CUNY's decision to promote Zubizarreta instead of plaintiff. Furthermore, although it is possible (as Gray suggests) that defendant Pignatello's judgment was so independent of Gray's as to sever the causal link from Gray's recommendation to

plaintiff's non-promotion, the pleaded facts suggest that Gray was in a strong position to influence the final decision-maker. Gray was, through his service as Director of Human Resources, well-acquainted with plaintiff, with Zubizarreta, and with the responsibilities of the Director's job. It is therefore plausible that Gray's recommendation strongly influenced Pignatello and CUNY's decision not to promote plaintiff.

Gray also argues that plaintiff has not alleged that Gray was personally involved in Zubizarreta's permanent appointment. It is true that Amended Complaint states such a connection directly only through an inadequate, conclusory allegation that "Zubizarreta was merely handpicked by defendants Pignatello and Gray." Am. Compl. ¶ 26. Nevertheless, at this stage, we consider it plausible from the relatively close timing of the two decisions and from Gray's status as former Director of Human Resources that (1) Gray intended his recommendation of Zubizarreta at the interim stage to influence CUNY's process for selecting a permanent replacement as well; and (2) Gray's recommendation actually influenced CUNY's permanent selection.

### C.   <u>Failure to State a Retaliation Claim</u>

The essence of plaintiff's retaliation claim is that, at least seven months after she filed a charge of discrimination, CUNY encouraged plaintiff's new supervisor, Lynette Cook-Francis, to

"manage Plaintiff out of her employment."  In making this request,
CUNY allegedly offered to assist Cook-Francis in removing plaintiff
and to reward Cook-Francis for doing so.  The complaint does not
say who at CUNY urged Cook-Francis to "manage plaintiff out,"
whether CUNY's agent had any position of authority over Cook-
Francis, or whether Cook-Francis took any action against plaintiff.

     Defendant CUNY accepts that plaintiff has plausibly pleaded
that, at some point since March 2013, some agent of CUNY made this
request of Cook-Francis.[10]  What CUNY disputes is (1) whether a mere
request that a supervisor "manage an employee out" constitutes an
adverse action, as a matter of law; and (2) whether plaintiff has
plausibly pleaded a connection between plaintiff's protected
activity (the SDHR and EEOC complaint that she filed in July 2012)
and CUNY's request.

### 1.   <u>Adverse Employment Action</u>

     At the outset, we must explain what we believe the jargon
"managing someone out" means.  Although the complaint does not
explain what exactly plaintiff means by these words (or whether the
unnamed CUNY agent used these words), we take the phrase to mean a

_____

[10]The complaint does not explain plaintiff's basis for believing that
someone at CUNY made this request, or for believing that the person who made
this request was acting on behalf of CUNY.  It is a close question whether the
complaint adequately pleads that CUNY made this request at all.  Nevertheless,
because defendant has not pressed the point, we will assume at this stage that
the request actually took place as the complaint states.  At summary judgment
or at trial, it will obviously be insufficient for plaintiff to rely on her
own unelaborated "information and belief."

combination of managerial techniques, short of formal termination, designed to encourage an employee to leave her job.  Cf. Oxford English Dictionary, manage, v., defn. 1.c (3d ed. 2000) ("'to manage (a person) out of': to force out or away; to expel") (quoting Independent (Bombay), Dec. 6, 1991, at 1 col. 2 ("He managed Senior Sena leader Chhagan Bhujbal, [sic] out of the party fold.")).  These techniques could include: advising an employee that her career paths within an organization are limited; encouraging her to seek work elsewhere; withholding praise or enhancing criticism; over-burdening her with formal and informal reviews and reporting requirements; assigning her a greater volume of work or less prestigious work; assigning her to work in an undesirable location; and so forth.  At best, "managing someone out" could mean an appropriate, frank dialogue about an irreparable mismatch between an employee's skills and her role; at worst, it could mean an unlawful constructive discharge.

Because plaintiff allegedly received a positive review shortly before CUNY encouraged Cook-Francis to manage her out, it is plausible to read the complaint as a factual allegation that CUNY's request was intended and understood as a request to constructively discharge plaintiff without regard to plaintiff's job performance.  Therefore, at this stage, we will refer to CUNY's request in the light most favorable to plaintiff—as a request to constructively

discharge plaintiff.  We warn, however, that plaintiff should not take any false comfort in how we characterize CUNY's alleged request.  At summary judgment or at trial, plaintiff must produce persuasive evidence that CUNY's request was actually intended and understood in this manner.

With this in mind, we conclude that an employer may commit an "adverse employment action" under <u>White</u> by asking an employee's supervisor to constructively discharge the employee, even if the employee's supervisor does nothing in response to the employer's request, because merely asking a supervisor to discharge an employee could dissuade a reasonable worker from making a charge of discrimination.

An informal request to terminate an employee can serve the same function as temporarily placing a formal reprimand in the employee's file, which was held to be an adverse action in <u>Millea v. Metro-North</u>, 658 F.3d at 165.  In neither case does the mere existence of the request or reprimand tangibly harm the employee. Instead, both an informal request and a formal reprimand increase the possibility that an employee's supervisors will take some tangible action against the employee at some point in the future. Such a "cloud over [the employee's] career," <u>Velikonja</u>, 466 F.3d at 124, or "fear of economic retaliation," <u>White</u>, 548 U.S. at 73 (quoting <u>Mitchell v. Robert DeMario Jewelry, Inc.</u>, 361 U.S. 288,

292 (1960)), could plausibly dissuade a reasonable employee from prosecuting a discrimination charge.

CUNY cites cases holding that "close monitoring, without more" is not a materially adverse action under the standard of <u>White</u>. <u>See</u> <u>Deshpande v. Medisys Health Network, Inc.</u>, No. 07-cv-375 (KAM)(VVP), 2010 WL 1539745 at *14 (E.D.N.Y. Apr. 16, 2010) (summary judgment order), <u>aff'd</u>, 423 F. App'x 31 (2d Cir. 2011); <u>see also</u> <u>Stoddard v. Eastman Kodak Co.</u>, 309 F. App'x 475, 479 (2d Cir. 2009) (doubting that closer scrutiny and "blackball[ing]" constituted adverse actions); <u>Scott v. Cellco P'ship</u>, No. 98-cv-7245 (LMM), 2007 WL 1051687 at *2 (S.D.N.Y. Apr. 3, 2007) (holding at summary judgment stage that general reprimands for lateness and "excessive scrutiny" did not constitute adverse actions), <u>aff'd</u>, 312 F. App'x 436 (2d Cir. 2009).

CUNY's point is well-taken, and we emphasize that plaintiff will lose at summary judgment or at trial if the evidence shows that CUNY's request was actually a request for Cook-Francis to monitor plaintiff more closely.  However, plaintiff's complaint survives at this stage, on our assumption that CUNY asked Cook-Francis to constructively discharge plaintiff.  An employer's request that a supervisor discharge an employee——whether formally or constructively——is significantly more adverse than mere "close monitoring," because a reasonable employee would think twice before

-27-

filing a discrimination claim if she knew that her employer would respond by asking her immediate supervisor to find a way to manage her out.

### 2.   Causation

CUNY next asks us to conclude as a matter of law that plaintiff has not stated the element of causation, because too much time elapsed between plaintiff's administrative complaint and CUNY's alleged request to Cook-Francis.

CUNY relies principally on <u>Clark County School District v. Breeden</u>, 532 U.S. 268, 272–74 (2001), in which the Supreme Court held that an adverse action 20 months after plaintiff filed an EEOC complaint could not establish a prima facie case of retaliation. <u>See also</u> <u>Richmond v. ONEOK, Inc.</u>, 120 F.3d 205, 209 (10th Cir. 1997) (cited favorably by <u>Breeden</u>) (three-month gap too long to establish causation); <u>Hughes v. Derwinski</u>, 967 F.2d 1168, 1174–75 (7th Cir. 1992) (cited favorably by <u>Breeden</u>) (four-month gap too long to establish causation); <u>Murray v. Visiting Nurse Servs. of New York</u>, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (collecting cases within the Second Circuit in which a gap of 2–3 months was too long to establish causation).

The flaw in CUNY's argument——at this stage——is that each of these cases was decided at summary judgment, where the plaintiff must produce enough evidence to convince the court that a

reasonable fact-finder could infer the likelihood of causation.[11] In these cases, the plaintiffs attempted to make a prima facie case of causation by pointing to nothing more than the timing of the plaintiff's protected activity and the defendant's adverse action. We, however, are now at the motion to dismiss stage, where plaintiff need not make out a prima facie case, Swierkiewicz, 534 U.S. at 515, and need only "raise a reasonable expectation that discovery will reveal [such] evidence." Twombly, 550 U.S. at 556.

Although a seven-month gap is almost certainly too long, taken by itself, to make causation probable, it is not so long as to render causation implausible. Plaintiff's retaliation claim therefore survives at this stage because it is plausible that CUNY's agent waited seven months to retaliate——perhaps because it took seven months for the unknown wrongdoer to learn of plaintiff's administrative charges, or because the unknown wrongdoer viewed the hiring of a new Student Affairs manager as a convenient opportunity to remove plaintiff from the organization, or because the unknown wrongdoer wished to see whether plaintiff would naturally fail at her new job, or for some other reason.

---

[11] CUNY cites only one case in which a court granted a motion to dismiss on similar grounds. See Jackson v. N.Y. State Office of Mental Health, No. 11-cv-7832 (GBD)(KNF), 2012 WL 3457961 at *10–12 (S.D.N.Y. Aug. 13, 2012) (report and recommendation), adopted, 2012 WL 5862741 at *2 (S.D.N.Y. Nov. 15, 2012) (reviewing for clear error in the absence of objections). This case, however, relied on summary judgment cases without discussing the significant difference between pleading a plausible claim and establishing a prima facie case.

Although we deny CUNY's motion to dismiss the retaliation claim, we cannot over-emphasize the steep hurdles that plaintiff will face at summary judgment or at trial.  At the threshold, plaintiff must establish the fact that CUNY actually asked Cook-Francis to take some action with respect to plaintiff.  Plaintiff must then establish that CUNY's request was effectively a request for Cook-Francis to constructively discharge plaintiff.  Plaintiff must then establish, through stronger evidence that mere temporal proximity, that CUNY's request was a response to plaintiff's administrative filings.  Finally, plaintiff must establish damages.[12]  Given the scanty allegations in plaintiff's complaint, plaintiff must gather substantially more evidence to overcome each of these hurdles.  Barring her ability to do so, nothing in this opinion should give plaintiff unwarranted optimism that her retaliation claim will survive summary judgment or prevail at trial.

## IV.  REDUNDANT CLAIMS AGAINST OFFICIAL DEFENDANTS

When a plaintiff states viable claims against an entity, district courts in this Circuit have routinely dismissed redundant claims against officers in their official capacities.  See, e.g.,

---

[12]Although we do not discuss damages at length in this Memorandum, we suspect that it will be challenging for plaintiff to prove compensatory damages, given that plaintiff never suffered any tangible harm and that plaintiff pressed her discrimination claims in spite of CUNY's alleged retaliation.  Punitive damages are not available against CUNY.  See 42 U.S.C. § 1981a(b)(1) (authorizing punitive damages under Title VII except against "a government, government agency or political subdivision").

<u>Yu v. N.Y.C. Hous. Dev. Corp.</u>, No. 07-cv-5541 (GBD), 2011 WL
2183181 at *1 n.1 (S.D.N.Y. June 3, 2011), <u>appealed on other
grounds and aff'd</u>, 494 F. App'x 122 (2d Cir. 2012); <u>Alster v.
Goord</u>, 745 F. Supp. 2d 317, 339 (S.D.N.Y. 2010).

Plaintiff's section 1983 claim is the only official-capacity
claim to survive our sovereign immunity analysis.  Because the
legal standards for employment discrimination claims under Title
VII and section 1983 are essentially identical, <u>see Feingold</u>,
366 F.3d at 159, we dismiss the official-capacity claims under
section 1983 as redundant.[13]

<u>**CONCLUSION**</u>

For the foregoing reasons, we dismiss all claims against
defendants Gray, Pignatello, and Travis in their official
capacities.

_____

[13]This is an alternative justification for dismissing plaintiff's
official-capacity claims under the State Human Rights Law, but <u>not</u> an
alternative justification for dismissing plaintiff's official-capacity claims
under the City Human Rights Law.  The City Human Rights Law must be
interpreted "liberally for the accomplishment of [its] uniquely broad and
remedial purposes . . ., regardless of whether federal and New York State
civil and human rights laws, including those laws with provisions comparably-
worded to provisions of this title[,] have been so construed."  Loc. Civil
Rights Restoration Act of 2005, N.Y.C. Loc. L. No. 85 (amending N.Y.C. Admin.
Code § 8-130); <u>see Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.</u>, 715 F.3d
102, 108-09 (2d Cir. 2013).  It is thus conceivable that plaintiff will
prevail under the City Human Rights Law, but not under Title VII.  In such a
circumstance, we could (leaving aside the bar of sovereign immunity) award
equitable relief through defendant Travis.

The surviving claims are:

1.   for discrimination and retaliation, against defendant
     CUNY, under Title VII; and

2.   for discrimination only, against defendants Gray and
     Pignatello in their individual capacities, under section
     1983, the State Human Rights Law, and the City Human
     Rights Law.

The Clerk of Court is directed to terminate defendants Gray,
Pignatello, and Travis in their official capacities.  The remaining
parties shall confer and propose a schedule for discovery.

**IT IS SO ORDERED.**

Dated:     New York, New York
           January   8 , 2015

                                  NAOMI REICE BUCHWALD
                                  UNITED STATES DISTRICT JUDGE

-32-

Copies of the foregoing Order have been mailed on this date to the following:

*Counsel for Plaintiff*:
Lennox S. Hinds, Esq.
Stevens, Hinds & White, P.C.
116 West 111th Street
New York, NY 10026

*Counsel for Defendants*:
Alissa S. Wright, Esq.
Steven L. Banks, Esq.
Office of the Attorney General
120 Broadway
New York, NY  10271